## THE ARTHUR CONNERS.

## CONNERS MARINE CO., Inc., v. PETER F. CONNOLLY CO., Inc.

District Court, S. D. New York.

Oct. 31, 1940.

Purdy & Lamb, of New York City (Edmund F. Lamb, of New York City, of counsel), for libelant.

John P. Smith, of New York City (Charles F. Bachmann, of New York City, of counsel), for respondent.

LEIBELL, District Judge.

Libellant moves for an order sustaining its objections to certain interrogatories propounded to libellant and annexed to respondent's answer herein. The allegations of the libel and the answer are well summarized in the following extract from respondent's brief:

. The libellant alleges that on the morning of November 9, 1939, the tug "Arthur Conners" was proceeding down the Raritan River with the scow "William D. McCoy" in tow. That the respondent had engaged in the construction of a bridge across the

Raritan River and had erected certain piers in said river. It is claimed, between the piers in the channel of said river, the respondent had caused to be placed certain barges, scows, derricks and other equipment so as to block the channel entirely causing the tug to alter its course and attempt to pass between piers out of the channel and thereby run aground. The libellant claims that the respondent was negligent in obstructing and blocking a navigable channel and in failing to give notice to vessels that the channel would be obstructed. On the other hand, as appears in the respondent's verified answer, the respondent claims that whatever work it did with reference to the bridge construction across the Raritan River was done in strict conformity with authority granted it by the proper governmental authorities. That on the day of the occurrence the channel was clear and unobstructed with ample clearance between the piers for navigation, and that it gave due and timely notice of its operations in the river, and that by reason thereof the libellant should have known of the manner in which the respondent was carrying on its operations there. The respondent further charges that the accident was caused by the negligence of the libellant in that its employees were incompetent and inattentive to their duties; failed to maintain a good and sufficient lookout; caused the tug to run aground outside of an open and obvious, clear channel, and in general, failed to navigate the tug in a reasonably prudent manner.

Of the 25 interrogatories propounded Nos. 1 to 4, inclusive, are not objected to and Nos. 24 and 25 have been withdrawn. That leaves interrogatories 5 to 23, all of which have been objected to by libellant. These interrogatories are hereto annexed in Appendix A.

The main objections of the libellant to these interrogatories are that they constitute a fishing expedition into the libellant's evidence; that they are not directed to particulars of libellant's cause of action; that they do not relate to matters on which respondent has the burden of proof. The case of Coronet Phosphate Co. v. United States Shipping Co., D.C., 260 F. 846, states the tests to be applied in determining whether the interrogatories propounded are proper. The following is quoted from page 849 of Judge Learned Hand's opinion in 260 F.: "Interrogatories in the admiralty serve two purposes, to amplify the plead-

ings of the party interrogated, and to procure evidence in support of the libel or defense of the party interrogating. Bock v. International Nav. Co. (D.C.) 124 F. 711; The Baker Palmer (D.C.) 172 F. 154. They should not, however, be used merely to fish into the evidence which the party interrogated may produce in support of his own allegations. This limitation upon discovery has remained even in the most modern rules of procedure. A party is of course entitled to know whether his opponent admits the truth of his own allegations, and how far, so as to avoid unnecessary preparation for trial. He is not entitled to know what evidence his adversary will produce to prove the adversary's allegations, and what evidence he must himself produce to overcome the case so made. The result will, of course, be, as it has been in the past, that he must go to trial somewhat in the dark as to what he must meet. The pleadings are intended to advise him of that, and interrogatories are proper to reduce those allegations to very specific form. They should be encouraged for that purpose, but so far as they call upon the pleader to go further, and give, not only the details of his allegations, but the evidence by which he means to prove them, they are liable to abuse. If there develop on the trial a case of genuine surprise, the court, especially where there is no jury, has ample power to protect the party surprised."

Applying this test to the interrogatories submitted, I am of the opinion that the objections to all the interrogatories except No. 19 should be overruled. The objection to interrogatory No. 19 is sustained because the interrogatory seems to be a fishing expedition.

The answers to interrogatories Nos. 5, 6, 7, 8, 9, 11, 14, 22 and 23 will serve to amplify the allegations of the libel. The answers to interrogatories Nos. 10, 12, 13, 15, 16, 17, 18, 20 and 21 may adduce evidence in support of respondent's defense:— that libellant had due and timely notice of respondent's operations in the river and of the regulations in respect thereto; that libellant's tug was navigated in a faulty manner, in that the crew were inattentive to their duties, did not maintain a proper lookout, and caused and permitted the tug to run aground outside of an open and obvious, clear channel.

The attorneys have given some space in their briefs to a discussion of the

question, whether the promulgation of new Admiralty Rule 31, 28 U.S.C.A. following section 723, which is the same as Rule 33, F.R.C.P., 28 U.S.C.A. following section 723c, in respect to interrogatories, means that the former admiralty decisions as to the scope of interrogatories are to be discarded and the broader provision of Rule 26(b), F.R.C.P., applied. New Admiralty Rule 31 makes some changes in the method of addressing interrogatories to an opposing party and in bringing on the objections (formerly exceptions) to the interrogatories propounded. Interrogatories propounded in civil actions under Rule 33, F.R.C.P., may cover the same scope as a deposition under Rule 26. Moore's Federal Practice, Vol. 2, pp. 2608 to 2616; Chandler v. Cutler-Hammer, Inc., D.C., 31 F.Supp. 453; Dunleer Co. v. Minter Homes Corp., D.C., 33 F.Supp. 242.

Rule 81, F.R.C.P., provides that the Federal Rules of Civil Procedure shall not apply to proceedings in admiralty. If it had been the intention of the Supreme Court to make any part of Rule 26(b), F.R.C.P., apply to the scope of interrogatories in admiralty cases under Admiralty Rule 31 it would have done so specifically. The fact that the Supreme Court did not incorporate the provisions of Rule 26(b), F.R.C.P., into the new Admiralty Rules relating to interrogatories left undisturbed the standards governing the scope of interrogatories in admiralty cases, as established by the decisions of the courts. Admiralty Rule 31 is procedural only. In the present case there would not be any real difference in the result, except perhaps as to interrogatory No. 19.

Submit order on notice, in accordance with this opinion.

### Appendix A.

5. State where libellant claims the channel ordinarily employed for navigation was located with respect to each shore of the river or with respect to the bridge piers.

6. State where, with respect to the bridge piers, the tug "Arthur Conners" was when she observed that the channel was blocked.

7. State the compass direction in which the tug "Arthur Conners" was proceeding, or if compass bearing cannot be given, the point or points used as bearings or ranges by the tug "Arthur Conners" at the time she observed that the channel was blocked.

8. State how far from each shore the tug "Arthur Conners" was at the time she observed that the channel was blocked.

9. At what point in the Raritan River did the tug "Arthur Conners" alter its course?

10. At what point in said river could those in charge of the navigation of the tug "Arthur Conners" observe the four piers nearest the northerly shore of said river?

11. As the tug "Arthur Conners" approached said piers, was the space between the four piers nearest the northerly shore obstructed? If so, what is the description of such obstruction and where were they located with reference to said piers?

12. Did the person or persons in charge of the navigation of the tug "Arthur Conners" observe any lights on either of the four piers nearest the northerly shore? If so, describe the same.

13. Did Conners Marine Co. Inc. notify its employees, particularly its employees on board the tug "Arthur Conners" at the time of the occurrence complained of, concerning respondent's operations in the Raritan River?

14. When the tug "Arthur Conners" altered its course, as stated in the libel, what course did it then take? Did it take a course leading it out of the channel?

15. In altering the course of the tug "Arthur Conners", did those in charge of the navigation thereof know that such alteration would cause the said tug to run aground?

16. Did those in charge of the navigation of the tug "Arthur Conners" attempt to stop said tug before it altered its course? Was any attempt made to anchor said tug while it was still afloat?

17. Was any whistle signal of any kind sounded by the tug "Arthur Conners"? If so, what signal was blown?

18. State the number of crew on watch at the time referred to in the libel.

19. Where was each of said crew on watch on the tug and what was each one engaged in doing when the tug altered its course?

20. What member of the crew was at the wheel of the tug "Arthur Conners" when its course was altered?

21. What member of the crew gave the order to alter the course of the tug "Arthur Conners"?

22. After the course of the tug "Arthur Conners" was altered, between what piers did the said tug attempt to pass?

23. At the time the tug "Arthur Conners" altered its course, what was the nature of the obstruction, if any, between the four piers nearest the north shore which is claimed to have prevented the tug "Arthur Conners" from proceeding, including a description of any alleged vessels or equipment sufficient to permit identification?